```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
                  Civil No. 08-5830(DSD/JJK)
```

Kevin John Kintzi,

       Plaintiff,

v.                                                   **ORDER**

Office of the Attorney General,
Department of Justice,

       Defendant.

      Kevin J. Kintzi, 250 West River Ridge Circle, Burnsville, MN 55337, pro se.

      Friedrich A.P. Siekert, Assistant U.S. Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, counsel for defendant.

This matter is before the court upon the motion of defendant the Office of the Attorney General to dismiss and for summary judgment. Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants defendant's motion.

**BACKGROUND**

In this action, pro se plaintiff Kevin John Kintzi ("Kintzi") asserts claims under the Federal Tort Claims Act ("FTCA") and the Freedom of Information Act ("FOIA") against the Office of the Attorney General. Kintzi's claims arise out of care he received at

the Minneapolis VA Medical Center ("MVAMC"). Kintzi, a veteran, has received medical care at the MVAMC for twenty years.

The events giving rise to this action began in April 2003, when Kintzi injured his right heel. On May 4, 2003, Kintzi sought treatment at a medical center in California, where doctors cleaned, examined, dressed and x-rayed his wound. (Admin. R. 209-10.) The x-ray revealed "soft tissue disruption over the heel, with no evidence of osteomyelitis." (Id. at 209.) Kintzi's doctor diagnosed him with "chronic cellulitis" and recommended admission to the hospital for treatment, but Kintzi refused. (Id. at 209-10.) When Kintzi returned to the medical center on May 17, 2003, his doctor's impression was "[c]ellulitis of the right heel in a diabetic smoker who should be admitted to the hospital, but refuses." (Id. at 212-13.)

After returning to Minnesota, Kintzi sought care at the MVAMC on May 22, 2003. At that time, an x-ray revealed no evidence of osteomyelitis, and Kintzi was diagnosed with a right foot ulcer. (Id. at 372-73, 1687.) Doctors again recommended hospital admission for antibiotic treatment, but Kintzi refused. (Id. at 1687.) Five days later, Kintzi returned. (Id. at 1682.) His doctor "strongly urged" admission to the hospital, but Kintzi still refused. (Id.) According to his doctor, Kintzi's wound required "aggressive debridement and [] care" and would not heal if Kintzi continued to walk on it. (Id.) Kintzi agreed to used crutches to

2

avoid pressure on the heel and "realize[d] his non-compliance may cause loss of the foot." (Id.) Kintzi finally consented to admission to the MVAMC on June 7, 2003, and was immediately placed on intravenous ("IV") antibiotics. (Id. at 1672-73.) During his four-day admission, a podiatrist debrided the ulcer, consulted with prosthetics for a special weight offloading shoe, urged Kintzi to quit smoking and recommended no weight bearing on the right foot. (Id. at 1669.)

Thereafter, from June 2003 through July 2004, Kintzi received treatment for the ulcer on an outpatient basis. During this time period, Kintzi visited the MVAMC Podiatry Clinic twenty-seven times. (Id. at 1603-58.) Doctors employed multiple treatments, including wound debridements, topical wound care products, home dressing care, vacuum assisted closure ("VAC") dressings, skin graft substitutes, an offloading foot brace, total contact casting, periodic oral antibiotics, and continued clinical monitoring for infection. (Id.) Despite these efforts, doctors routinely rated Kintzi's ulcer as a "Grade II" and attributed the lack of progress to Kintzi's excessive smoking and continued ambulation against medical advice. (Id. at 1603-05.)

In July 2004, Kintzi consulted with a non-VA podiatrist, Dr. Gerard Busch ("Busch"). Busch diagnosed Kintzi with a Grade III ulcer and ordered a bone scan. The July 19, 2004, scan revealed findings consistent with osteomyelitis. On July 21, 2004, Busch

3

prescribed Kintzi antibiotics, gave him a new weight offloading shoe and recommended IV treatment.

Kintzi returned to the MVAMC for follow-up care. On August 13 and 27, 2004, doctors recommended inpatient IV treatment, but Kintzi refused admission. (Id. at 1590-1600.) Kintzi finally consented to admission on August 31, 2004. (Id. at 1590.) Over a two-month period, Kintzi again received antibiotics, VAC dressings, wound debridement and care, CT scanning and consultations with orthopedics, medicine, infectious disease, plastic surgery and other specialities. (Id. at 1464-1584.) During the course of his treatment, the suspected osteomyelitis cleared, but Kintzi's ulcer remained. (Id. at 520-24.) Kintzi did not follow his antibiotic regimen and the no-smoking and no-weight-bearing instructions, and insisted on leaving the hospital before his wound had healed. (Id. at 515, 520-24.) Kintzi's discharge instructions reiterated the no-weight-bearing admonition. (Id. at 522.)

After traveling to California, Kintzi returned to the MVAMC on January 27, 2005. (Id. at 1449.) Kintzi's doctor noted that he was still bearing weight on his heel, and instructed Kintzi to offload the weight or "healing will not occur." (Id.) After receiving periodic care over the next six months, Kintzi was again admitted to the MVAMC on July 1, 2005, after his wound became reinfected. (Id. at 1413-16.) X-rays revealed osteomyelitis which Kintzi's doctor attributed to a "combination of poor sensation in

4

feet and poor wound care." (Id. at 1416.) During his admission, Kintzi received antibiotics, a bone biopsy, and a skin graft. Shortly after receiving the graft, however, Kintzi bore weight directly on his foot, causing the graft to fail. (Id. at 656.) Doctors again noted Kintzi's chronic non-compliance with the no-smoking and no-weight-bearing instructions. (Id. at 514-16.) Kintzi remained in the hospital until October 12, 2005. (Id. at 514.)

Thereafter, Kintzi periodically returned to the MVAMC for treatment. He was hospitalized again for IV treatment for possible osteomyelitis from March 2 to 16, 2006. (Id. at 512-13.) Kintzi continued to ambulate and smoke against medical advice. (Id.) Upon discharge, doctors repeated the previous recommendations. (Id.)

Around this time, Kintzi began to inquire about amputation of his right foot. Kintzi consulted with the MVAMC's Amputee Clinic on April 18, and with orthopedics on June 14 and July 3, 2006. (Id. at 634-42.) According to Kintzi's doctor, Kintzi was "unwilling to quit smoking" and "unwilling to maintain non-weight bearing status" and was "convinced that he needs an amputation." (Id. at 638.) Doctors recommended amputation on the basis that Kintzi's "long term chronic wound ... did not show any healing potential" and "numerous appropriate attempts had been made [to heal the wound]." (Id. at 510, 634.) On July 6, 2006, MVAMC

5

doctors performed an amputation below Kintzi's right knee. (Id. at 510.)

As required by the FTCA, Kintzi first filed a tort claim with the Department of Veterans Affairs ("DVA") Regional Counsel on December 21, 2004,[1] claiming that the MVAMC negligently failed to x-ray his foot and seeking $4,000 in medical expenses. (Kintzi Dep. Ex. 1.) The DVA Regional Counsel denied Kintzi's claim on September 22, 2005. (Id. Ex. 6.) Kintzi requested reconsideration on March 1, 2006. (Id. Ex. 7.) After review, the DVA General Counsel denied Kintzi's claim on April 24, 2008. (Id. Ex. 8.)

Kintzi's FOIA claim began on June 24, 2008, when he submitted a FOIA request to the DVA for "[m]inimum standards of care for a diabetic foot ulcer by this hospital and especially [the] podiatry clinic." (Siekert Decl. Ex. A-1.) On July 15, 2008, the DVA denied Kintzi's request on the basis that no such documents existed. (Id. Ex. A-4.) On July 21, 2008, Kintzi appealed the determination and also requested copies of his medical records and other information. (Id. Exs. B-1, B-2.) The DVA released Kintzi's medical records the following day and Kintzi's treating physician provided him a written explanation of his treatment on July 31,

---

[1] The parties agree that Kintzi has satisfied the FTCA's administrative requirements. See Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993).

2008. (Id. Exs. A-5, B-3.) On February 10, 2009, the DVA General Counsel denied Kintzi's appeal, finding that the DVA had fully complied with the FOIA request. (Id. Ex. A-5.)

Kintzi filed the instant complaint on October 23, 2008, alleging medical negligence pursuant to the FTCA, violation of the FOIA and wrongful denial of veterans benefits under 38 U.S.C § 511.[2] On December 28, 2009,[3] defendant filed a motion to dismiss and for summary judgment. The court now considers defendant's motion.

**DISCUSSION**

**I. Motion to Dismiss**

Defendant first argues that the court should dismiss this action because Kintzi should have named the United States of America as defendant, not the Office of the Attorney General.

---

[2] At oral arguments on April 2, 2010, the parties agreed to the dismissal of Kintzi's benefits claim. Indeed, the court must dismiss this claim due to lack of subject matter jurisdiction. See 38 U.S.C. § 511(a) (Secretary of Veterans Affairs decisions on benefits "may not be reviewed by any other official or by any court"); see also Thomas v. Basham, 931 F.2d 521, 522-23 (8th Cir. 1991) (court must dismiss an action over which it does not have subject matter jurisdiction). The Veterans Judicial Review Act provides the exclusive review procedure for veterans who disagree with a benefits decision. See Hicks v. Veterans Admin., 961 F.2d 1367, 1369 (8th Cir. 1992). Accordingly, the court grants defendant's motion to dismiss with respect to Kintzi's benefits claim.

[3] Defendant amended its motion on February 19, 2010. (Doc. No. 26.)

Indeed, FTCA claims must be asserted against the United States. See 28 U.S.C. §§ 1346(b)(1), 2672, 2679(b)(1). Under the FOIA, a complaint may be brought against an agency or agency head. See 5 U.S.C. § 552. The court, however, liberally construes Kintzi's complaint to state claims against the United States and the DVA. See Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004) (liberally interpreting pro se complaints). Moreover, the interests of justice and efficiency support deciding Kintzi's claims on the merits. Accordingly, the court will not dismiss Kintzi's claims on this basis.

**II. Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving

party.  See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

### III.  FTCA Claim

Pursuant to the FTCA, Kintzi alleges that MVAMC doctors committed medical malpractice by failing to x-ray his right foot in spring 2004.  According to Kintzi, this omission caused osteomyelitis in his right foot to remain undetected and untreated, eventually resulting in amputation.  The FTCA imposes liability on the United States for torts committed by "'any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the complainant in accordance with the law of the place where the act or omission occurred.'"  Johnson v. United States, 534 F.3d 958, 962 (8th Cir. 2008) (quoting 28 U.S.C. § 1346(b)(1)).  It is undisputed that MVAMC doctors are government employees for purposes of the FTCA.  To establish a prima facie case of medical malpractice under Minnesota law, Kintzi must demonstrate through expert testimony the

applicable standard of care and that the MVAMC departed from this standard, directly causing his injury. See Fabio v. Bellomo, 504 N.W.2d 758, 762 (Minn. 1993) (citation omitted).

In addition, Kintzi must comply with Minnesota's expert-review and disclosure requirements. As set forth in Minnesota Statutes § 145.682, a plaintiff alleging medical malpractice must furnish two affidavits. First, a plaintiff must submit an "affidavit of expert review" with the complaint, stating that an expert qualified to testify at trial has reviewed the case and that, in the expert's opinion, the defendant deviated from the standard of care, injuring the plaintiff. Minn. Stat. § 145.682 subdivs. 2, 3(a). In addition, the plaintiff must submit an expert identification affidavit within 180 days after commencement of the suit. Id. § 145.682 subdivs. 2, 4. That affidavit must identify the expert witness who will testify and summarize the expert's expected testimony and the grounds for each opinion. Id. § 145.682 subdiv. 4(a). Importantly, "it is not enough for the plaintiff's affidavit of expert identification to simply repeat the facts in the hospital or clinic record." Stroud v. Hennepin County Med. Ctr., 556 N.W.2d 552, 555 (Minn. 1996) (citation omitted). Rather, the affidavit must state "specific details concerning the expert['s] expected testimony, including ... an outline of the chain of causation between the violation of the standard of care and plaintiff's damages." Id. at 555-56. These requirements apply without

exception to pro se plaintiffs, and failure to comply requires dismissal of the claim with prejudice. Minn. Stat. § 145.682 subdivs. 5, 6; Broehm v. Mayo Clinic Rochester, 690 N.W.2d 721, 726 (Minn. 2005).

In this case, Kintzi submitted a February 26, 2007, report from Busch. In the report, Busch addresses Kintzi's medical condition from May 2003 to July 2004. (Compl. Ex. A at 1.) Specifically, Busch reviews Kintzi's medical records from this time period and sets forth the applicable standard of care for podiatrists in the Minnesota medical community. (Id. Ex. A at 1-2, 4-6.) Busch then opines that MVAMC podiatrists deviated from the standard of care by failing to take x-rays in spring 2004 to assess the presence of osteomyelitis in Kintzi's right heel. (Id. Ex. A at 7-8.) Busch states that this omission allowed the osteomyelitis "to develop and go undetected and untreated to the point that proper treatment subsequently provided could not prevent the amputation of the foot." (Id. Ex. A at 8.)

After review, the court determines that Busch's report is insufficient for purposes of § 145.682. Most significantly, the report does not outline a chain of causation. As noted above, the report only addresses the May 2003 to July 2004 time period and, consequently, fails to account for pertinent events between the alleged violation of the standard of care in spring 2004 and Kintzi's July 2006 amputation. For instance, Busch's report does

11

not account for MVAMC doctors' successful treatment of Kintzi's osteomyelitis. Kintzi's medical records indicate that after Busch detected osteomyelitis in July 2004, MVAMC doctors treated Kintzi and the condition cleared by October 2004. (Admin. R. at 520-24.) When Kintzi was again hospitalized for osteomyelitis in July 2005 and March 2006, he was similarly treated. (Id. at 512-13, 1413-16.) In addition, Busch did not review Kintzi's medical records immediately prior to amputation, which indicate that Kintzi sought an amputation due to his unwillingness to follow the doctors' recommendations - not because of osteomyelitis. Moreover, Busch did not address the impact of Kintzi's chronic non-compliance with medical advice on his wound. Lastly, neither Busch nor Kintzi offer any evidence that detection of osteomyelitis prior to July 2004 would have changed the course of Kintzi's treatment. Therefore, Busch's report fails to satisfy § 145.682 because it offers only broad and conclusory statements as to causation. The report also fails because it does not set forth Busch's qualifications to testify as an expert. For these reasons, the court determines that Kintzi has not complied with the "absolute mandate" of § 145.682, and dismissal of Kintzi's medical malpractice claim is required. Paulos v. Johnson, 502 N.W.2d 397, 400 (Minn. 1993) (affirming dismissal of pro se plaintiff's claims for failure to comply with § 145.682).

**IV. FOIA Claim**

Kintzi next alleges a FOIA violation based upon the DVA's failure to supply him with documents stating the MVAMC's minimum standards of care for a diabetic foot ulcer. (See Siekert Decl. Ex. A-1.) The FOIA creates a judicially enforceable right to access government documents. See Miller v. U.S. Dep't of Agric., 13 F.3d 260, 262 (8th Cir. 1993). The court reviews an agency's denial of a FOIA request de novo, and the burden is on the agency to sustain its action. Barney v. Internal Revenue Serv., 618 F.2d 1268, 1272 (8th Cir. 1980). To discharge this burden, the agency must prove that the requested document "either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements." Miller v. U.S. Dep't of State, 779 F.2d 1378, 1383 (8th Cir. 1975) (citation and internal quotation marks omitted). The court uses a reasonableness standard to judge the adequacy of an agency's search. Id. In other words, the agency must show "that it has conducted a search reasonably calculated to uncover all relevant documents." Id. (citation and internal quotation marks omitted). While the search must be reasonable, it need not be exhaustive. Id.

In this case, the DVA denied Kintzi's request after finding no responsive documents. As noted by defendant, "[t]he physicians who treated [Kintzi] used their clinical judgment with respect to [Kintzi's] situation and followed applicable standards of care for

13

the community based on their training, knowledge and experience, not on a single document or documents that outline how to treat a patient with the same presenting symptoms or situation." (Def.'s Resp. to Req. No. 1 [Doc. No. 30] 1-2; see also Siekert Decl. Ex. A-4.) No evidence before the court indicates that the document Kintzi seeks exists. Therefore, the court determines that the DVA conducted a reasonable search and properly denied Kintzi's request. Accordingly, the court grants defendant's motion for summary judgment on this claim.

## CONCLUSION

Based on the above **IT IS HEREBY ORDERED** that defendant's motion to dismiss and for summary judgment [Doc. No. 26] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated  May 20, 2010

s/David S. Doty
David S. Doty, Judge
United States District Court